UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PING ZHAO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-10188-MAP |
| | ) | |
| BAY PATH COLLEGE and | ) | |
| GINA SEMPREBON, | ) | |
| | ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' PARTIAL MOTION TO DISMISS
(Document No. 13)
October 25, 2013

NEIMAN, U.S.M.J

Presently before the court is a motion by Bay Path College ("BPC") and Gina
Semprebon ("Semprebon") (together "Defendants") seeking dismissal of six of the
seven statutory and tort claims brought by Ping Zhao ("Plaintiff"). Plaintiff's amended
complaint advances claims that BPC violated her right to equality in education under
Title IX, 20 U.S.C. 1681 *et seq.* (Count 1), discriminated against her on the basis of sex
in violation of Title VII, 42 U.S.C. 2000(e) *et seq.*, and Title IX (Count 2), violated the
Massachusetts Fair Employment Practices Act, MASS. GEN. LAWS ch. 151B (also Count
2), retaliated against her in violation of Title VII, Title IX, and MASS. GEN. LAWS ch. 151B
(Count 3), and breached her employment contract (Count 5). As for Semprebon,
Plaintiff claims that she violated MASS. GEN. LAWS ch. 151B by discriminating (Count 2)
and retaliating (Count 3) against her, aided and abetted discrimination in violation of
MASS. GEN. LAWS ch. 151B (Count 4), tortiously interfered with her advantageous
relations (Count 6), and intentionally inflicted emotional distress upon her (Count 7).[1]

---

[1] It should be noted that Counts 2 and 3 of Plaintiff's *original* complaint contained
claims that Semprebon individually violated Titles VII and IX. In their partial motion to

As presently framed, Defendants' motion seeks dismissal of Count 4, which targets Semprebon, on grounds that Plaintiff cannot establish a *prima facie* case for aiding and abetting discrimination as her allegations in support of that claim are not separate and distinct from her main claims of discrimination.  Defendants also seek dismissal of Counts 5 through 7 -- the breach of contract claim against BPC as well as the tortious interference and intentional infliction of emotional distress claims against Semprebon -- based on the exclusivity provision of MASS. GEN. LAWS ch. 151B.

Defendants' motion has been referred to this court by District Judge Michael A. Ponsor for a report and recommendation.  *See* 28 U.S.C. § 636(b)(1)(B) and FED. R. CIV. P. 72(b).  For the reasons which follow, the court will recommend that Defendants' motion be denied.

## I. STANDARD OF REVIEW

Generally, a complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## II. BACKGROUND

Accepting as true the allegations in Plaintiff's complaint, the facts, which are quite extensive, are as follows.  Plaintiff was born in China, and has a Bachelor of Science in Physics, a Ph.D. in Material Engineering, and a Masters in Statistics.  (Complaint at ¶

---

dismiss -- filed before Plaintiff amended her complaint -- Defendants seek dismissal of these claims against Semprebon because Titles VII and IX do not provide for individual liability.  Plaintiff has since conceded the point.

15.)  In 1999, Plaintiff moved to Massachusetts, where her husband was and continues to be employed, and since March 2004 she has been a citizen of the United States. (Id.)  On August 26, 2005, Plaintiff commenced employment at BPC as a full-time Assistant Professor of Mathematics and Coordinator of the Mathematics Program.  (Id. at ¶ 23.)  She was the first full-time mathematics faculty member at BPC and was hired to build the college's program.  (Id.)  At the time BPC hired Plaintiff, the college did not offer math as a major or a minor.  (Id. at ¶ 24.)

BPC does not have a tenure system.  (Id. at ¶ 27.)  At the time of Plaintiff's employment, BPC confirmed faculty appointments for each academic year via letter from its Provost/Vice President of Academic Affairs; William Sipple performed this duty from 2005 to summer of 2010, as did his successor, Melissa Morriss-Olson, from the summer of 2010 to November 2011.  (Id. at ¶¶ 27, 18-19.)  The annual letters of appointment reference "the statutes and handbooks of the College" as a source of the terms and conditions of employment, which materials include a sexual harassment policy.  (Id. at ¶ 28.)  From Plaintiff's initial 2005 appointment through the 2011-2012 academic year, she continually received and accepted yearly contractual offers of employment from BPC.  (Id. at ¶29.)

Plaintiff's direct supervisor until January 27, 2010, was Semprebon.  (Id. at ¶ 22.)  As such, Semprebon had the authority to evaluate Plaintiff's performance, make recommendations and determinations regarding pay raises and promotions, set and adjust her class schedule, and approve or deny her requests for travel, continuing education, and other work-related activities and reimbursements.  (Id. at ¶ 25.)  Semprebon also had the power to recommend Plaintiff's discipline and termination.  (Id.)

Semprebon told Plaintiff that she was close friends with BPC's President, Carol Leary, and further claimed that she used her influence to facilitate BPC's hiring because

Plaintiff's interview with President Leary did not go well.  (Id. at ¶ 26.)  Semprebon impressed upon Plaintiff that BPC was a small college, that she was a very powerful and influential member of the staff, and that Plaintiff would need her protection.  (Id.)

Plaintiff's first BPC performance review was for the 2005-2006 academic year. At BPC, the highest faculty rating for overall performance and other performance categories is "Noteworthy," meaning "[p]erformance was consistently well above expectations; contributions were noteworthy and individual served as a role model for others."  (Id. ¶ 30.)  The second highest rating is "Proficient," meaning that "[p]erformance met expectations; included contributions to the department and to the College."  (Id.)  Semprebon evaluated Plaintiff that year.  (Id.)  For the majority of performance categories, Plaintiff received the score "Noteworthy"; in overall performance Plaintiff earned the rating "Proficient."  (Id.)  Semprebon also noted that Plaintiff was "one of the most highly motivated faculty members [she] has ever seen and extremely dedicated to service," had "elevated the standard of math instruction tremendously," and "motivated several [students] to want to pursue a math minor at the College."[2]  (Id.)

Semprebon often used her positive performance evaluation of Plaintiff to "remind" Plaintiff of Semprebon's clout at BPC.  (Id. at ¶ 31.)  Semprebon also exercised her power over Plaintiff to maintain close contact with her.  For example, Plaintiff asserts, Semprebon interfered or attempted to interfere with her projects and assigned Plaintiff to work on scientific projects with her.  (Id. at ¶ 32.)  Semprebon also

---

[2]  In fact all of Semprebon's evaluations of Plaintiff appear to have been positive. Semprebon evaluated Plaintiff for the 2006-2007, 2007-2008, and 2008-2009 academic years.  During these years, Plaintiff received a rating of "Noteworthy" for the majority of the performance categories as well as in overall performance.  (Id. at ¶¶ 44, 66, 72.)  In addition, during the 2008-2009 academic year BPC chose Plaintiff as the first recipient of its highest honor awarded to BPC faculty, the President's Award for Excellence in Innovative Thinking.  (Id. at ¶ 72.)

confided in Plaintiff that the departure of certain faculty members from BPC was connected to their dealings and relationships with Semprebon.  (Id. at ¶ 33.)

In June of 2006, BPC promoted Plaintiff to the position of Director of the Mathematics Program and reappointed her as Assistant Professor.  (Id. at ¶ 34.)  Six months later, in December 2006, Plaintiff was working on a project with a lead math teacher at BPC's Central Massachusetts Campus, Dr. John Rulnik.  (Id. at ¶ 36.) Semprebon told Plaintiff that Dr. Rulnik sent an unflattering email about Plaintiff.[3]  (Id.) Semprebon claimed she was urging Dr. Rulnik's termination.  (Id.)  Dr. Rulnik's supervisor, Dr. Vana Nespor, met with Plaintiff and requested that Plaintiff give him a second chance.  (Id.)  Plaintiff was willing to do so, but BPC terminated Dr. Rulnik.[4]  (Id. at ¶¶ 36-37.)  Semprebon told Plaintiff the termination resulted from Semprebon's recommendation, actions, and close connection to BPC's Associate Vice President for Academic Affairs/Dean of the Tradition Program; Ann Dobmeyer.[5]  (Id. at ¶ 37.)

On the evening of Dr. Rulnik's termination, Plaintiff stayed in her office late into the evening, crying.  (Id. at ¶ 39.)  Semprebon arrived at Plaintiff's office uninvited.  (Id. at ¶ 40.)  Under the premise of consoling Plaintiff, Semprebon professed her sexual and romantic feelings toward Plaintiff.  (Id.)  Semprebon stated that, although she had a live-in female partner with whom she shared a long-term relationship, she "needed [Plaintiff's] love."  (Id.)  Plaintiff stated she was married and rebuffed Semprebon's advances.  (Id.)

Semprebon also told Plaintiff she was "so beautiful," that Semprebon was "reborn" when she met her, that Semprebon needed her, and that Semprebon "wanted

---

[3]  It is not immediately clear to whom or for what purpose the e-mail was sent.
[4]  Semprebon initiated an employment-termination action against Dr. Nespor five months later.  (Id. at ¶ 38.)  Semprebon called Dr. Nespor a "monster" and claimed credit for her departure.  (Id.)

[5]  August 2011 Dobmeyer became Dean of Research and Academic Resources. (Id. at ¶¶ 20-21.)

to bring the Plaintiff to a place no one knows but her." (Id. at ¶ 41.) Semprebon further divulged to Plaintiff details regarding her own sexual experiences; she told Plaintiff of "various sexual liaisons she had with other academics both male and female; and she claimed she had no romantic feelings towards her long-time live-in partner." (Id. at ¶ 42.)

In January 2007, "overcome by confusion and fear regarding her future at BPC given Semprebon's stated and apparent authority and power over [Plaintiff's] professional life, [Plaintiff] gave in to Defendant Semprebon's sexual advances. This made [Plaintiff] profoundly uncomfortable, and caused her to experience severe emotional distress." (Id. at ¶ 43.) In May 2007, Semprebon pressured Plaintiff into attending a conference with her in Europe. At this time, Semprebon subjected Plaintiff to repeated unwelcome sexual contacts. (Id. at ¶ 46.)

From early 2007 forward, Plaintiff made several attempts to end the sexual contact with Semprebon.[6] (Id. at ¶ 49.) In response, Semprebon reminded Plaintiff of her influence and stated that she needed Semprebon's "protection" and, on more than one occasion, implied that she would use her position to instigate Plaintiff's downfall at BPC if Plaintiff refused her. (Id. at ¶¶ 50-51.) Plaintiff believed that, when she allowed Semprebon's advances, Semprebon did not interfere with her work, but that attempts to end these interactions had a negative impact on her work, as follows: Semprebon instigated or caused problems between Plaintiff and other BPC faculty/staff; refused to make needed or requested class-schedule changes, even to accommodate student needs contrary to BPC's usual practice; fabricated charges against her, and reported her to Human Resources claiming she was "out of control" and acting unprofessionally. (Id. at ¶ 52.)

---

[6] Plaintiff's complaint sometimes refers to the interactions between Plaintiff and Semprebon in terms of "sexual harassment" or "harassment." (*See e.g.*, Id. at ¶¶ 49, 73.)

In late 2007 or early 2008, several meetings took place between Plaintiff and Dean Dobmeyer.  Plaintiff reported her workplace problems with Semprebon, but she was too fearful to report any sexual conduct.  (Id. at ¶ 54.)  Plaintiff also requested that BPC separate the Math Department from the Science Department so Plaintiff could "get away from" Semprebon.  (Id. at ¶ 55.)  Dean Dobmeyer initially agreed and enunciated plans for a distinct Math Department with Plaintiff as the Chair.  (Id. at ¶ 56.)  Based on this discussion, Plaintiff engaged in the hiring process to fill a position with the Department.  (Id. at ¶ 57.)

On April 14, 2008, Plaintiff overhead science professor Ed Bernstine speaking negatively about her to another faculty member.  Plaintiff attempted to explain to the professors what she believed was a misunderstanding, but Professor Bernstine grew angry, and was shaking and yelling at Plaintiff.  Plaintiff claims to have "gently tapped Professor Bernstine on his forearm in an attempt to calm him," he did calm down, and the pair solved their problem.  (Id. at ¶ 58.)

One week later, Semprebon told Plaintiff that Professor Bernstine alleged Plaintiff was "out of control" and "struck him for no reason."  (Id. at ¶ 59.)  Although Semprebon advised Plaintiff to take the matter to Human Resources, Plaintiff instead requested Semprebon "stay out of it" and approached Professor Bernstine directly.  Plaintiff was unsuccessful in resolving the issue.  Semprebon told Plaintiff that Professor Bernstine was accusing Plaintiff of blackmail and stated that she "was the only person who could protect [Plaintiff]."  (Id.)  Soon after this incident, Plaintiff told Semprebon their interactions with each other might result in Plaintiff leaving BPC.  (Id. at ¶ 60.)  Semprebon responded that this would make her unhappy, that Professor Bernstine intended on filing a charge against Plaintiff, and that as long as she was with Semprebon, she would be protected.  (Id.)  Eventually Plaintiff was exonerated of these allegations and, during a Human Resources meeting, she and Professor Bernstine were

advised to shake hands.  (Id. at ¶¶ 64-65.)

At or around the same time of these events, Plaintiff completed the hiring process for a full-time faculty member for the purported Math Department.  (Id. at ¶ 61.) President Leary rejected the hiring of Plaintiff's candidate, and the Math and Science Departments remained combined and under the control of Semprebon.  (Id. at ¶ 62.) The sexual contact between Plaintiff and Semprebon also continued during the 2008-2009 academic year.  On May 12, 2009, Plaintiff confronted Semprebon about their sexual interaction and its effects on the lives of others.  (Id. at ¶ 73.)  Plaintiff thereafter refused to engage in sexual contact with Semprebon.  (Id.)

In fall 2009, a female visiting professor affectionately hugged Plaintiff in Semprebon's presence.  Semprebon appeared visibly angered that the two hugged. (Id. at ¶ 78.)  The following day, Plaintiff went to Semprebon's office to discuss a scheduling conflict brought to her attention by two students.  (Id. at ¶¶ 79-81.) Semprebon, Plaintiff, and another professor had a discussion in which Semprebon told Plaintiff she would not change the schedule, although Semprebon invited Plaintiff back to her office after the discussion.  At that time, Semprebon immediately called Human Resources and accused Plaintiff of "being out of control and acting unprofessionally." (Id. at ¶ 83.)

Plaintiff requested a private meeting with BPC's Director of Human Resources, Kathleen Halpin-Robbins.  (Id. at ¶ 87.)  Meanwhile, Semprebon apologized to Plaintiff for calling Human Resources and promised she would "clear things up" with Halpin-Robbins.  (Id.)  Semprebon, however, did not withdraw her accusations.  (Id. at ¶ 88.) In any event, the private meeting between Plaintiff and Halpin-Robbins took place on November 10, 2009.  (Id. at ¶ 89.)  Plaintiff reported Semprebon's hostile actions toward her as well as Semprebon's attempts to create antagonism between her and others at BPC.  (Id.)  Again, Plaintiff did not reveal the sexual nature of her interactions with

Semprebon, fearing the retaliation and embarrassment potentially accompanying such a disclosure.  (Id.)  Halpin-Robbins appeared supportive and stated she would speak with Dean Dobmeyer and Provost Sipple regarding Plaintiff's contacts with Semprebon; she also said she would address the organization of the Math and Science Departments. (Id. at ¶ 90.)

Plaintiff met with Halpin-Robbins a second time on November 12, 2009.  Halpin-Robbins stated that the Provost refused to get involved, that Semprebon was Plaintiff's boss, that Plaintiff was to report to Semprebon and follow her instructions, and "that BPC would not deal with the problems created by Defendant Semprebon."  (Id. at ¶ 91.) After Plaintiff's meeting, Semprebon told Plaintiff "I will kill you if you reveal the relationship."  (Id. at ¶ 92.)

On November 19, 2009, Plaintiff asked Semprebon when she was going to withdraw her allegations to Human Resources.  (Id. at ¶93.)  Semprebon became angry, pointed her finger at Plaintiff, and said something to the effect of "I told you I am the most powerful person here . . . I'm in charge . . . you should know who you are and who you are dealing with . . . you can get fired for no reason."  (Id.)  Plaintiff became upset, told Semprebon to "stop it" and left Semprebon's office.  Semprebon followed Plaintiff to her office, where Plaintiff was inside crying, and repeatedly knocked on the door and requested admittance.  Plaintiff did not respond.

Later that day, as Plaintiff was leaving campus, she noticed Halpin-Robbins and Dean Dobmeyer in Semprebon's office.  (Id.)  Plaintiff went to Semprebon's office whereupon Semprebon announced that she called Human Resources out of concern for Plaintiff's safety.  (Id. at ¶ 85.)  The next day, Plaintiff, Halpin-Robbins and Dobmeyer met without Semprebon.  Plaintiff advised them of Semprebon's actions and her need to "get away" from her.  (Id. at ¶ 96.)  Again, Plaintiff did not disclose the sexual aspects of

her relationship with Semprebon because she feared retaliation and embarrassment. (Id.)

On December 2, 2009, Halpin-Robbins and Dean Dobmeyer requested a meeting with Plaintiff.  At the meeting, they informed Plaintiff that they would support Semprebon, that Semprebon was Plaintiff's boss, that she must follow Semprebon's orders, and that "BPC would no longer deal with the problems created by Semprebon and that the matter was closed."  (Id. at ¶ 97.)  On the same day, Plaintiff met with Halpin-Robbins and told her "how Semprebon used her power over the terms and conditions of [Plaintiff's] employment to pressure and force her into having sex with her." Plaintiff also told Halpin-Robbins about her attempts to end the sexual contact and her need to "get away from Semprebon."  (Id. at ¶ 99.)  Plaintiff requested Halpin-Robbins inform President Leary of the situation and asked for a meeting with President Leary and Provost Sipple.  (Id.)

One week later, Halpin-Robbins told Plaintiff that she conducted an "investigation."  (Id. at ¶ 101.)  Halpin-Robbins stated that Semprebon denied the harassment as well as the allegation that the two of them had sex.  Halpin-Robbins did not contact Plaintiff during the investigation; Plaintiff did not have an opportunity to refute claims made by Semprebon or provide proof in support of her claims of sexual harassment and a hostile work environment.  When Plaintiff offered evidence ostensibly supporting her position, Halpin-Robbins refused to pursue the matter.  (Id. at ¶ 103.)  At the conclusion of the meeting Plaintiff requested Semprebon be replaced as her supervisor and asked that the substitute be someone other than Dean Dobmeyer.  (Id. at ¶ 107.)

On January 27, 2010, a meeting took place between Plaintiff, Halpin-Robbins, Dean Dobmeyer, and Semprebon.  (Id. at ¶ 108.)  Plaintiff and Semprebon were required to sign a two-page "Memorandum."  Plaintiff now claims that she did not have

enough time to fully read the document.  (Id.)  The Memorandum stated that "unwelcome" contact took place between Plaintiff and Semprebon and that their working relationship was "not functional."  (Id.)  The Memorandum did not change the reporting structure between Semprebon and Plaintiff; however, Dean Dobmeyer was assigned to evaluate Plaintiff, to oversee challenges regarding scheduling and hiring tutors, to review/approve/deny requests requiring a BPC chair's signature, and to handle requests for additional materials or resources.  Pursuant to the Memorandum, BPC also removed Plaintiff from her role as student advisor and further delayed the separation of the Math and Science Departments.[7]  (Id. at ¶ 110.)

Following the January 27, 2010 meeting and Memorandum, Plaintiff alleges that BPC meddled in aspects of her employment, in particular that BPC (1) interfered with her ability to renew her memberships in the American Statistical Association and Mathematical Association of America, associations critical to her professional standing and development, her ability to attend a 2010 summer conference, approvals of her summer courses, her work on projects, her evaluations of the performance of math faculty, and her role in hiring adjunct faculty and her hiring of a student assistant; (2) denied (a) Plaintiff the opportunity to develop a graduate statistics course, (b) her request to hire a statistics professor, (c) payment for course overloads, and (d) her request to attend a statistics conference; (3) removed Plaintiff from email distribution lists; and (4) dropped students from her courses days before the semester's start.  (Id. at ¶ 116.)  Furthermore, Plaintiff asserts, Dean Dobmeyer and Halpins-Robbins failed to respond to Plaintiffs emails and telephone calls and refused to acknowledge Plaintiff's

---

[7]  In addition, on January 27, 2010, Semprebon received a "Notice of Policy Violation – Warning" for engaging in a "supervisor/supervisee relationship."  (Id. at ¶ 112.)  Semprebon did not otherwise experience adverse terms and conditions of her employment.  That fall, BPC allowed Semprebon to take a one-semester sabbatical. (Id. at ¶ 124.).

presence.  (Id. at ¶ 117.)  Plaintiff also asserts that she was prohibited from eating at the faculty lunch table, while Semprebon was permitted to do so.  (Id. at ¶ 111.)

Plaintiff first sought medical treatment for emotional distress in March 2010.  (Id. at ¶ 118.)  In August 2010, Plaintiff emailed President Leary and Provost Sipple's successor, Provost Morriss-Olson, to complain about retaliation and extreme emotional distress; she also stated she was unsure if she could continue to work in BPC's environment.  (Id. at ¶ 122.)  On September 2, 2010, Plaintiff met with Provost Morriss-Olson and Dean Dobmeyer to discuss the harassment and retaliation.  Dean Dobmeyer stated that decisions regarding these complaints were the province of Human Resources, and the Provost set up a meeting between Plaintiff and Halpin-Robbins. (Id.)  At that meeting Halpin-Robbins blamed former Provost Sipple for previous decisions regarding Plaintiff's complaints.  (Id. at ¶ 125.)

On October 10, 2010, Dean Dobmeyer conducted two performance evaluations of Plaintiff.  Plaintiff received a rating of "Proficient" in most performance categories as well as for her overall performance.[8]  Following this evaluation, on October 14, 2010, Plaintiff became so distraught that she became physically ill and experienced severe headaches.  (Id. at ¶ 127.)  Plaintiff requested paid sick leave and one day later met with Provost Morriss-Olson, Dean Dobmeyer, and Halpin-Robbins.  (Id. at ¶ 128.) Provost Morriss-Olson became hostile toward Plaintiff and stated that she fully supported Dobmeyer and Halpin-Robbins.

The request for paid sick leave apparently was unresolved until October 22, 2010, when Provost Morriss-Olson and Dean Dobmeyer requested to meet with her. During the meeting, Plaintiff was denied paid sick leave and presented with three options: (1) take unpaid sick leave, (2) see a doctor, or (3) leave campus.  (Id. at ¶ 129.) Plaintiff indicated she would retain legal counsel.

---

[8]  Plaintiff also received a rating of "Proficient" in her final, 2011 evaluation.  (Id. at ¶ 140.)

One week later, Plaintiff again met with Provost Morriss-Olson and Halpin-Robbins. BPC stated that Plaintiff was not required to leave campus. Unable to take unpaid sick leave, Plaintiff withdrew her request. (Id. at ¶ 130.)

That semester, BPC changed Plaintiff's class schedule without prior notice several times. (Id. at ¶ 132.) As a result, Plaintiff contacted Halpin-Robbins and Provost Morriss-Olson for assistance. (Id. at ¶¶ 133-35.) BPC continued its support of Dean Dobmeyer's actions. (Id. at ¶ 136.) Presumably in response to these events, on December 15, 2010, Plaintiff emailed Halpin-Robbins, Provost Morriss-Olson, and President Leary and stated she was considering a lawsuit against BPC. (Id. at ¶ 137.) In January 2011 Plaintiff requested a meeting with President Leary regarding her work environment. (Id. at ¶ 138.) The request was denied.

In early April 2011, Provost Morriss-Olson and Dean Dobmeyer met with Plaintiff, announced BPC was creating a Math Department, informed her that it intended to use an outside hire as Department Chair, but told her that she would remain a faculty member. This demoted Plaintiff from the position of "director" and eliminated her administrative duties. BPC created the Math Department in the School of Management and Social Justice in the summer of 2011, hiring Dr. Farrokh Saba as chair. (Id. at ¶¶ 146-47.)

During the 2011 fall semester, Plaintiff encountered additional scheduling issues. As a result, Plaintiff contacted Dr. Saba, who advised Plaintiff to contact Geoffrey Mills, the Dean of the School of Management and Social Justice. (Id. at ¶ 147.) Plaintiff and Mills exchanged emails between November 12 and November 16, 2011, but did not resolve the issue. (Id. at ¶ 148.) On November 16, 2011, in response to Dean Mills' open invitation to meet with him, Plaintiff went to his office. (Id. at ¶ 149.) While Plaintiff spoke with Mills, a security officer arrived at the door and entered the office. (Id. at ¶ 150.) Mills then told Plaintiff to "calm down."

13

The next day, Plaintiff was on her way to Dr. Saba's office when security stopped her and escorted her to Halpins-Robbins' office.  Halpin-Robbins and Lead Security Officer Vincent Rossi then questioned Plaintiff regarding her interaction with Mills the day prior.  (Id. at ¶ 151.)  Mills had accused Plaintiff of raising her voice, barring him from leaving his office, and pushing him.  (Id. at ¶ 153.)  BPC suspended Plaintiff with pay and prohibited her from being on campus and having contact with students.  (Id.)  Plaintiff was handed a letter and escorted from the premises.  BPC apparently canceled Plaintiff's class for that day before this meeting.  (Id. at ¶ 152.)

Thereafter, Plaintiff's interactions with BPC were limited to requesting and receiving her personnel file and a policy handbook, and her retained counsel's statement to BPC that, due to Plaintiff's health, she was unable to attend a meeting requested by BPC between Plaintiff, Halpin-Robbins, and Lead Security Officer Vincent Rossi.  (Id. at ¶¶ 156-58.)  By letter dated November 23, 2011, BPC fired Plaintiff.  (Id. at ¶ 159.)

On April 12, 2012, Plaintiff filed a Charge of Discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD").  (Id. at ¶ 8.)  On July 10, 2012, Plaintiff filed an Amended Charge of Discrimination.  (Id. at ¶ 9.)  Though Plaintiff did not identify Semprebon as a respondent, Plaintiff named Semprebon several times and BPC's position statement included an affidavit from Semprebon.  (Id. at ¶ 10.)   Semprebon's affidavit stated that Plaintiff was the only "direct report" with whom she had sex.  (Id. at ¶ 102.)  On August 8, 2012, Plaintiff requested that MCAD close her case to allow Plaintiff to file the present action; MCAD complied with this request on August 15, 2012.  (Id. at ¶¶ 11-12.)  On November 6, 2012, Plaintiff requested that EEOC issue a Right-to-Sue letter to permit Plaintiff to file this case, which EEOC sent two days later.  (Id. at ¶¶ 13-

14.)  Plaintiff filed her complaint in the present matter on January 30, 2013.  On April 5,

2013, BPC and Semprebon filed individual answers and a joint partial motion to dismiss.

### III.  DISCUSSION

*A.  Counts 2 and 3: Semprebon's Individual Liability under Title VII and Title IX*

Defendants assert that the court should dismiss those parts of Counts 2 and 3

in the original complaint containing Plaintiff's Title VII and Title IX claims against

Semprebon, arguing that those statutes do not provide for individual liability.  In

relevant part, Count 2 claimed that BPC and Semprebon both engaged in sex

discrimination in violation of Title VII, and Count 3 alleged that BPC and Semprebon

retaliated against Plaintiff in violation of Title VII and Title IX.  Defendants do not

seek dismissal of those portions of Counts 2 and 3 directing claims against BPC or

chapter 151B claims against Semprebon.

The court need not address this particular request.  As previously noted,

Plaintiff's amended complaint, filed after Defendants filed their partial motion to

dismiss, clarified that these challenged parts of Counts 2 and 3, *i.e.*, the Title VII and

Title IX claims, are aimed solely at BPC and not Semprebon individually.[9]

Accordingly, the court need only acknowledge that Plaintiff concedes that the Title

VII and Title IX claims in Counts 2 and 3 do not target Semprebon individually.

*B.  Count 4: Aiding and Abetting Discrimination*

---

[9]  Plaintiff's motion to amend her complaint explained that the

> sole purpose for this proposed Amendment and the only
> changes in the Complaint are to clarify that Plaintiff's cause of
> action for sex discrimination and her cause of action for
> retaliation lie against both Defendants for violation of the
> Massachusetts Fair Employment Practices Act, M.G.L. c. 151B
> but solely against her former employer, Bay Path College, for
> violation of Title VII of the Civil Rights Act as amended, 42
> U.S.C. sec. 2000(e) *et seq.*, and for violation of Title IX, 20
> U.S.C. sec. 1681 *et seq.*

(Document No. 26.)  The court granted Plaintiff's motion on August 13, 2013.

Defendants' motion to dismiss Count 4, which asserts an aiding and abetting claim against Semprebon, involves the Massachusetts Fair Employment Practices Act, MASS. GEN. LAWS ch. 151B.  Generally speaking, chapter 151B "must be construed liberally for the accomplishment of its purposes—one of which was to discourage and penalize discriminatory conduct, including sexual harassment, by individuals—and the explicitly declared policy of the Commonwealth that all persons have the right to be free from sexual harassment."  *Beaupre v. Cliff Smith Assocs.*, 738 N.E.2d 753, 764-65 (Mass. App. Ct. 2000).

In applicable part, chapter 151B § 4(1) makes it unlawful

> [f]or an employer, by himself or his agent, because of the race, color, religious creed, national origin, sex, gender identity, sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object, genetic information, or ancestry of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

MASS. GEN. LAWS ch. 151B, § 4(1).  Chapter 151B § 4(5), in turn, prohibits "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."  Liability for aiding and abetting discrimination extends to "individuals, including co-employees of the allegedly aggrieved employee."  *Chapin v. Univ. of Mass. at Lowell,* 977 F. Supp. 72, 78 (D. Mass. 1997).  To prevail on an aiding and abetting claim

> a plaintiff must show (1) that the defendant committed a wholly individual and distinct wrong . . . separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under G.L. c. 151B.

16

*Lopez v. Commonwealth*, 978 N.E.2d 67, 82 (Mass. 2012) (quotations omitted).

Defendants argue that Plaintiff cannot establish a *prima facie* case against Semprebon for aiding and abetting discrimination because she has failed to allege facts showing that Semprebon committed "individual and distinct wrongs" from those alleged in the main discrimination and retaliation claims.  In Defendants' view, the fact that Plaintiff advances claims of discrimination and retaliation directly against Semprebon precludes an aiding and abetting claim against her based on the same direct acts.

Plaintiff counters that, while Semprebon coerced her into engaging in unwanted sexual contact, amounting to *quid pro quo* sexual harassment and a hostile work environment, she also asserts that these discrimination claims stand separate and apart from the facts supporting the aiding and abetting claim.  Plaintiff further asserts that courts have held individuals liable for aiding and abetting in far less compelling factual situations than present here.  In particular, Plaintiff relies on *Chapin*, where the court held a manager subject to liability for aiding and abetting discrimination due to his failure to act in response to reports of sexual harassment. 977 F. Supp. at 80.

It appears that the parties' arguments reflect somewhat different understandings as to which "main" claim of discrimination the court should measure Semprebon's aiding and abetting acts as "separate and distinct."  *Lopez*, 978 N.E.2d at 82.  No matter.  In the court's view, the complaint contains distinct factual allegations supporting the discrimination claims against both BPC and Semprebon, thereby facilitating the independent aiding and abetting claim against Semprebon. While the bulk of the factual material supporting Plaintiff's main claims of discrimination against Semprebon focuses on unwelcome verbal threats and sexual contact, the complaint also contains other allegations, particularly those relating to

BPC's investigation of Plaintiff's claims of sexual harassment and the role Semprebon played in that investigation, plausibly demonstrating Semprebon's supporting role in BPC's discrimination.  These events, it should be remembered, involve multiple participants; if Plaintiff is able to prove that BPC refused to adequately investigate her claims, as she alleges, Semprebon's role in BPC's investigation, if proven, would involve acts separate from those forming the direct discrimination claim against her.  *Cf. Fisher v. Town of Orange*, 885 F. Supp. 2d 468, 477 (D. Mass. 2012) (holding the plaintiff pleaded sufficient facts showing "joint activity" to survive motion to dismiss aiding and abetting discrimination claim). Accordingly, the court suggests, it would be premature to dismiss Plaintiff's aiding and abetting discrimination claim against Semprebon.

### C. Counts 5 through 7: Common Law Claims

Defendants also seek dismissal of Count 5 (the contract claim against BPC), Count 6 (the tortious interference claim against Semprebon), and Count 7 (the emotional distress claim against Semprebon).  Defendants argue that, as common law claims, they are barred by the exclusivity provision of chapter 151B insofar as they are founded on the same allegations as Plaintiff's statutory discrimination and retaliation claims.  In support, Defendants rely on *Charland v. Muzi Motors, Inc.*, 631 N.E.2d 555 (Mass. 1994).

In *Charland*, the Massachusetts Supreme Judicial Court held that, "where applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections."  *Id.* at 559.  Two years later, however, in *Green v. Wyman-Gordon Co.*, the SJC acknowledged that chapter 151B does not bar all common law claims such as intentional and negligent infliction of emotional distress.  664 N.E.2d 808, 813 (Mass. 1996) (citing *Comey v. Hill*, 438 N.E.2d 811 (Mass. 1982)).  However, the SJC also

ruled that, to the extent a plaintiff's common law claims are "merely recast versions of . . . sexual harassment claims under c. 151B, they are barred by that statute's exclusivity provision." *Id.*

Two principles inform this court's analysis as to whether chapter 151B precludes Plaintiff's common law claims under the SJC's holdings in *Charland* and *Green.* First, as the SJC explained in *Comey*, 438 N.E.2d at 817, chapter 151B "broadens existing remedies rather than requiring resort to it as exclusive of all other remedies." Second, as is generally understood, "common law rights that existed before the adoption of ch. 151B are not barred by the exclusivity provisions." *Chapin*, 977 F. Supp. at 83; MASS. GEN. LAWS ch. 151B, § 9 (stating "nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination"). For example, chapter 151B does not preclude the common law torts of assault and battery which have been available since at least the nineteenth century. *Chapin*, 977 F. Supp. at 84. In contrast, "there can be no common law action for wrongful discharge on the ground that age discrimination violates an implied covenant of good faith and fair dealing" because "the creation of a new common law action based on the public policy expressed in that statute would interfere with [chapter 151B's] remedial scheme." *Long v. Am. Int'l Adjustment Co.*, 1986 WL 9806, at *1 (D. Mass. Mar. 12, 1986) (quotation omitted). Accordingly, to resolve the present dispute, the court must "determine whether the causes of action alleged by [Plaintiff] existed before the adoption of ch. 151B." *Chapin,* 977 F. Supp. at 84. With these principles in mind, the court now turns to each of Plaintiff's common law claims, finding in the end that each should survive dismissal.

*a. Breach of Contract*

In Defendants' view, Plaintiff bases her breach of contract claim, Count 5, on BPC's acts of discrimination and retaliation rather than any separate independent act by BPC, thereby running afoul of chapter 151B's exclusivity provision.  Plaintiff counters that she and BPC entered into a contract and that BPC thereafter fired her, failed to pay wages due under the contract, and even barred her from the campus. The fact that unlawful discrimination and/or retaliation may have supplied the motive for BPC's breach of the contract, Plaintiff asserts, does not defeat the contract claim itself.  Plaintiff, in the court's view, has the better argument.

The relationship between chapter 151B and the common law tort of breach of contract was examined in *Long*, a case involving several claims against a former employer, including claims of age discrimination in violation of chapter 151B and breach of contract.  1986 WL 9806, at *1.  The plaintiff argued that the contract was breached because the employer failed to follow certain procedures outlined therein prior to his termination.  The court explained, as is true here, that the "question is whether an existing common law remedy for breach of contract was superseded by a subsequent statutory enactment."  *Id.* at *2.  Concluding that the plaintiff stated a claim for breach of contract, the court reasoned that the plaintiff did not seek the creation of "a new common law remedy fashioned out of public policy."  *Id.*  The court continued: "The wrong he complains of here — the protected interest — is not age discrimination, but his dashed contractual expectations, that his employer would abide by procedures for discipline and termination it agreed to when it hired him."  *Id.*

Here too, in this court's opinion, Plaintiff states an adequate common law claim for breach of contract.  As in *Long*, the wrong Plaintiff complains of is not discrimination generally or wrongful termination, but rather her thwarted contractual expectations.  Plaintiff derived these expectations from a written contract which

outlined the duration and terms of her employment.  The fact that Plaintiff alleges

discriminatory animus as part of the underlying circumstances for the breach of that

contract does not, in the court's view, preclude the contract claim itself.


### b. Tortious Interference with Advantageous Relations

Defendants also seek to dismiss Count 6, Plaintiff's claim that Semprebon

tortiously interfered with her advantageous relations with BPC itself.  Again,

Defendants maintain that the allegations supporting this claim are the same as those

underlying Plaintiff's claims for discrimination and retaliation, namely that

Semprebon interfered with Plaintiff's employment contract with BPC by subjecting

her to sexual harassment, a hostile work environment, discrimination and retaliation,

and that such conduct ultimately led to her termination.  The court disagrees.

The SJC addressed and rejected a similar argument in *Comey*, and held that

chapter 151B does not "narrow or eliminate a person's common law rights where

applicable."  438 N.E.2d at 817.  "Particularly in the area of age discrimination," the

SJC continued, "the statute specifically states that 'nothing contained in this chapter

shall be deemed to repeal . . . any other law of the commonwealth relating to

discrimination because of age.' "  *Id.* (quoting MASS. GEN. LAWS ch. 151B, § 9).

District Judge Douglas Woodlock's recent decision in *McAleer v. Prudential

Insurance Co. of America*, 928 F. Supp. 2d 280 (D. Mass. 2013), which declined to

dismiss the plaintiff's tortious interference claim under a chapter 151B exclusivity

theory, provides further guidance.  Judge Woodlock found that the plaintiff did not

"simply disguise a wrongful termination claim as other common law claims.

Although the wrongful conduct and bad faith he alleges is based on age

discrimination, the substance of his tortious interference and breach of the covenant

of good faith and fair dealing claims are predicated on [the defendant's] withholding

commissions he earned while he was still employed there, not wrongful dismissal." *Id.* at 291.  The same is true here as well.  Plaintiff's claim is not simply a recast version of her sex discrimination claims.  She asserts that Semprebon's actions hindered her professional development at BPC, which interfered with her job title, duties, and relationship with other BPC faculty.  Granted, the wrongful conduct alleged may be rooted in discrimination, but the substance of Plaintiff's tortious interference claim is based on Semprebon's actions which resulted in a series of negative employment actions against her.  Accordingly, the court concludes, Plaintiff has adequately set forth a common law claim against Semprebon for tortious interference.

### c. Intentional Infliction of Emotional Distress

Finally, Defendants ask the court to dismiss Count 7, Plaintiff's claim for intentional infliction of emotional distress against Semprebon, on the same theory that chapter 151B's exclusivity provision bars this claim.  This argument is similarly unavailing.  The SJC clearly stated that the common law tort of intentional infliction of emotion distress is not barred by chapter 151B.  *Green*, 664 N.E.2d at 813; *see also Bourbeau v. City of Chicopee*, 445 F. Supp. 2d 106, 116-17 (D. Mass. 2006); *Chapin*, 977 F. Supp. at 84.

### IV. CONCLUSION

For the reasons stated, the court recommends that Defendants' motion to dismiss be DENIED (with the understanding, as clarified by Plaintiff, that the Titles VII and IX claims in Counts 2 and 3 are not being pursued against Semprebon individually).[10]

---

[10]  The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that

DATED: October 25, 2012

          /s/   Kenneth P. Neiman
          KENNETH P. NEIMAN
          U.S. Magistrate Judge

---

failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.